Filed 12/24/24  In re Iris A. CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| In re IRIS A., a Person Coming Under the Juvenile Court Law. | B329034 (Los Angeles County Super. Ct. No. 23CCJP00598) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. DARIUS A., Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Tara L. Newman, Judge.  Dismissed.

Benjamin Ekenes, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Aileen Wong, Senior Deputy County Counsel, for Plaintiff and Respondent.

_____

Darius A. (Father) appeals from the jurisdiction findings and disposition order declaring three-year-old Iris A. a dependent of the juvenile court under Welfare and Institutions Code section 300, subdivision (b)(1),[1] after the court sustained an allegation that Iris was at substantial risk of serious harm because Father had placed her in a dangerous situation during an encounter with police officers in January 2023.

On February 2, 2024, during the pendency of the appeal, the juvenile court terminated jurisdiction and entered a juvenile custody order granting Father and Kylamae V. (Mother) joint legal and physical custody of Iris. Because we cannot provide Father any effective relief, we dismiss the appeal as moot.

## FACTUAL AND PROCEDURAL BACKGROUND

On February 16, 2023 the Los Angeles County Department of Children and Family Services (Department) filed a petition under section 300, subdivisions (a) and (b)(1). The Department alleged under both subdivisions that Father and Mother had a history of engaging in violent altercations in front of Iris, and on January 31, 2023 Father threatened harm to Mother if she

---

[1] Further undesignated statutory references are to the Welfare and Institutions Code.

obtained a restraining order against him or took custody of Iris away from him.  The petition further alleged under subdivision (b)(1) that Father placed Iris "in a detrimental and endangering situation" during a confrontation with police officers on January 26, 2023.  During the incident, Father "held the child in front of the father's chest and held the child as a shield," and Father "was repeatedly tazed while [he] held the child."

During the course of its investigation the Department learned that on January 26, 2023 Father's neighbor called the police to report a domestic violence incident involving Father's girlfriend that occurred outside Father's apartment.  The neighbor stated a woman was "thrown out of the unit and a male comes and grabs the female and drags her back into the unit." According to the primary responding police officer and another police officer who had reviewed the responding officers' body camera footage, the officers listened outside Father's apartment door for approximately 10 minutes and heard a child crying. They knocked on the door repeatedly, but there was no response. Eventually, Father opened the apartment door while holding Iris in front of his chest like a shield.  Officers explained they were responding to a report of domestic violence and asked if they could enter the apartment.  Father would not allow the officers into the apartment, but they were able to push their way inside. They asked Father to put Iris down, but Father refused.  Father backed away from the officers toward the window and balcony. The officers were concerned that Father was moving toward the window, and they did not know whether a domestic violence victim was still in the apartment.  They pushed Father to the ground and used their taser on him twice while he was still holding Iris.  Father let go of Iris, and the officers tased Father

3

two more times.  Father was arrested for child endangerment, but no charges were filed.

Father's version of the events leading to his arrest differed in some respects from the police officers' accounts.  Father admitted he had a verbal altercation with his girlfriend outside of his apartment on the day of the incident, but Father and his girlfriend both denied there was any physical violence.  After the argument, Father's girlfriend left, and Father returned to the apartment where his uncle and cousin were with Iris.  The men decided to take Iris for a walk.  When Father opened the apartment door to leave, approximately 15 police officers were standing there.  Father denied that the police had knocked on the door or explained why they were there.  Father also insisted he was holding Iris on the side of his body and not in front of him like a shield.  When Father did not let the officers into the apartment, they pushed their way in and demanded he put Iris down.  He refused to put Iris down because he did not know what was going on and did not believe she was in danger.  The officers forced Father to the ground, tased him four times, and took Iris from him.  Father's account of the events was corroborated by his girlfriend, uncle, and cousin.

Mother told the Department social worker that she and Father had an informal custody arrangement pursuant to which they alternated physical custody of Iris each week.  Mother initially denied any domestic violence with Father but later admitted there had been two incidents where Father physically assaulted her in Iris's presence.  After one incident in 2020, Mother had called the police, but Father was not arrested.  Mother also reported that Father had been threatening her since the Department opened its investigation, saying he would take

4

Iris away. Mother was concerned that Father would retaliate against her if his visits were discontinued.

Father was combative with the social worker during his interviews. He yelled at the social worker and accused her of coercing Mother to get a restraining order against him. Father claimed he had no prior significant interactions with police officers or the Department. However, the social worker learned there had been a referral to the Department in 2022 after Father physically assaulted his ex-girlfriend while their daughter (Iris's half-sister) was in the home. The ex-girlfriend reported the assault to the police, but Father was not arrested, and the Department did not file a petition based on the allegations. The Department also learned Father had been convicted of felony possession of a concealed weapon in Michigan in 2017. He served a one-year jail sentence and completed his probation in 2019.

Father denied any responsibility for placing Iris in a dangerous situation. Father insisted the police officers had created the danger by failing to inform him of the reason for their presence and by backing him into a wall where he had no place to go. Father stated to the social worker that he was pursuing civil litigation against the police department based on the incident.

At the April 26, 2023 jurisdiction and disposition hearing, Father's counsel admitted that "Father was combative with the police." However, counsel argued the police "overreacted," which was likely why no charges had been filed against Father. Counsel requested the court strike the allegation regarding the confrontation with police officers because it was a one-time incident and the Department failed to show a similar situation was likely to recur.

The juvenile court dismissed the allegations regarding domestic violence, finding the Department had failed to meet its burden by a preponderance of the evidence. The court struck the language in the allegation regarding the confrontation with police officers that Father "held the child as a shield." The court sustained the allegation as amended by interlineation and declared Iris a dependent of the court. The court allowed Iris to remain in her parents' care under the Department's supervision. The court ordered Father to attend a 26-week anger management program and to participate in a parenting program and individual counseling. Father timely appealed.

At the January 24, 2024 review hearing (§ 364), the juvenile court terminated jurisdiction over Iris, and on February 2, 2024 the court entered a final juvenile custody order granting Father and Mother joint legal and physical custody of Iris.[2] Father did not appeal from the order terminating jurisdiction or the final juvenile custody order.

## DISCUSSION

A. *Mootness and Dependency Appeals*

"A court is tasked with the duty "'to decide actual controversies by a judgment which can be carried into effect, and not to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it."'" (*In re D.P.* (2023) 14 Cal.5th 266, 276 (*D.P.*).) "A case becomes moot when events

---

[2] On July 3, 2024 we granted Father's request to take judicial notice of the January 24, 2024 minute order and the final custody order. (Evid. Code, §§ 452, subd. (d), 459, subd. (a).)

"'render[ ] it impossible for [a] court, if it should decide the case in favor of plaintiff, to grant [the plaintiff] any effect[ive] relief.'" [Citation.]  For relief to be 'effective,' two requirements must be met.  First, the plaintiff must complain of an ongoing harm.  Second, the harm must be redressable or capable of being rectified by the outcome the plaintiff seeks." (*Ibid.*)  In other words, "relief is effective when it 'can have a practical, tangible impact on the parties' conduct or legal status.' [Citation.]  It follows that, to show a need for effective relief, the plaintiff must first demonstrate that he or she has suffered from a change in legal status." (*Id.* at p. 277.)

"[W]hen a parent has demonstrated a specific legal or practical consequence that will be averted upon reversal, the case is not moot, and merits review is required." (*D.P., supra*, 14 Cal.5th at p. 283.)  Accordingly, "a case is not moot where a jurisdictional finding affects parental custody rights [citation], curtails a parent's contact with his or her child [citation], or 'has resulted in [dispositional] orders which continue to adversely affect' a parent." (*Id.* at pp. 277-278.)  "Although a jurisdictional finding that a parent engaged in abuse or neglect of a child is generally stigmatizing, complaining of 'stigma' alone is insufficient to sustain an appeal.  The stigma must be paired with some effect on the plaintiff's legal status that is capable of being redressed by a favorable court decision." (*Ibid.*)

Even where an appeal is moot, however, "courts may exercise their 'inherent discretion' to reach the merits of the dispute." (*D.P., supra*, 14 Cal.5th at p. 282.)  As the Supreme Court explained in *D.P.*, reviewing courts will generally exercise their discretion when the case presents an issue of broad public interest that is likely to recur, there may be a recurrence of the

7

controversy between the parties, or a material question remains for the court to determine. (*Ibid*.) The court also identified additional factors reviewing courts may evaluate when considering whether to exercise their discretion to decide a moot case, including whether a challenged jurisdiction finding could impact current or future dependency proceedings, and the nature of the allegations against the parent (with more egregious findings showing a parent's greater interest in challenging the findings). (*Id*. at pp. 285-286.) In addition, reviewing courts may consider why the appeal became moot; for example, principles of fairness may favor discretionary review of cases rendered moot "by the prompt compliance or otherwise laudable behavior of the parent challenging the jurisdictional finding on appeal." (*Id*. at p. 286.) "It would perversely incentivize noncompliance if mootness doctrine resulted in the availability of appeals from jurisdictional findings only for parents who are less compliant or for whom the court has issued additional orders." (*Ibid*.)

B.    *Termination of the Juvenile Court's Jurisdiction Moots Father's Appeal[3]*

In his briefing on appeal Father challenges only the jurisdiction findings made by the juvenile court. He does not challenge the disposition order, nor has he appealed the court's order terminating jurisdiction or the final custody order. Because jurisdiction has been terminated and Iris has been returned to her parents' joint custody, the jurisdiction findings have no ongoing effect on Father's custody rights, nor do the findings continue to adversely affect Father. In other words, even if we were to reverse the jurisdiction findings, it would not change Father's legal status with respect to his parental rights.

---

[3]    The Department acknowledges that Father's appeal is moot but requests we consider the matter on the merits because "the question of mootness is now pending before the California Supreme Court" in *In re S.R.,* review granted September 11, 2024, S285759 (review granted from Court of Appeal order dismissing appeal as moot). On our own motion, we take judicial notice of the July 2, 2024 petition for review filed in *In re S.R.,* S285759. (Evid. Code, §§ 452, subd. (d), 459, subd. (a).) In her petition for review, the mother in *In re S.R.* argued her appeal was not moot because the jurisdiction findings could result in her inclusion in the Child Abuse Centralized Index (CACI). Specifically, the petition requested the Supreme Court consider "what evidence of CACI inclusion is required to defeat a mootness challenge" and/or remand the matter for the appellate court to reach the merits of the appeal because the mother had shown an ongoing adverse consequence of the jurisdiction finding as a result of being included in CACI. Father has not alleged inclusion in CACI as an adverse consequence of the jurisdiction findings. Thus, it is unlikely the Supreme Court's decision in *In re S.R.* will affect whether this appeal is moot.

9

Therefore, we can provide no effective relief—that is, relief that "'can have a practical, tangible impact on the parties' conduct or legal status.'" (*D.P.*, *supra*, 14 Cal.5th at p. 277; see *In re Rashad D.* (2021) 63 Cal.App.5th 156, 163 ["An order terminating juvenile court jurisdiction generally renders an appeal from an earlier order moot"].)

Father argues the jurisdiction finding could have a practical adverse effect on him because the finding "potentially could impact a civil proceeding against the City of Los Angeles arising out of father's arrest for child endangerment." However, even if the jurisdiction finding were admissible in a civil proceeding, which is far from clear, any potential effect would not be on Father's custody rights or legal status. Further, Father does not dispute the general facts underlying the jurisdiction finding—that he was combative with police officers while holding Iris; he refused to put Iris down when asked repeatedly by officers; and he did not release her until the officers used a taser on him. These facts would be admissible in a civil lawsuit regardless of whether the juvenile court's jurisdiction findings are reversed on appeal. And it is these facts, not the juvenile court's finding that Father's conduct placed Iris in a detrimental and endangering situation, that could potentially affect Father's lawsuit against the police department. Whether the police officers' conduct was justified was not at issue in this proceeding. Accordingly, Father's claim of future harm based on a potential civil lawsuit is speculative and insufficient to avoid mootness. (*D.P.*, *supra*, 14 Cal.5th at pp. 277-278.)

Father also argues we should exercise our discretion to reach the merits of his appeal because "the allegations that father was responsible for the endangering situation that arose

10

on January 26 are significant, given father was tased by law enforcement multiple times in his daughter's presence." However, as Father acknowledges, stigma alone is insufficient to sustain an appeal absent an effect on Father's legal status. (See *D.P., supra*, 14 Cal.5th at p. 277.) Further, as discussed, Father does not dispute the general underlying facts from which any stigma would arise. Finally, Father argues his prompt compliance with his case plan (within a year) justifies consideration of his appeal on the merits. While we commend Father for his compliance, this factor alone does not justify reaching the merits of this appeal. (See *id.*, at p. 286 ["no single factor is necessarily dispositive of whether a court should exercise discretionary review of a moot appeal"].)

## DISPOSITION

The appeal is dismissed as moot.


                                        FEUER, J.

We concur:



    SEGAL, Acting P. J.



    STONE, J.


11